Jack E. LYDIC, Appellant,

v.

Dreana LYDIC, Appellee.

Court of Appeals of Kentucky.

Oct. 28, 1983.

Discretionary Review Denied
March 21, 1984.

B. Carlton Neat, III, Louisville, for appellant.

M. Larry Miller, John C. Dodson, Louisville, for appellee.

Before HOWARD, MILLER and REYNOLDS, JJ.

HOWARD, Judge.

The appellant appeals from a judgment of the trial court denying his motion to terminate payment of maintenance to his former wife on the grounds that substantial changes in circumstances have made their separation agreement unconscionable.

The appellant ("Jack") and the appellee ("Dreana") were married June 2, 1961, and their marriage was dissolved on March 22, 1974. Their decree of dissolution incorporated a separation agreement which had been executed by the parties on December 28, 1973. This agreement provided, in part:

5. Petitioner shall pay the Respondent as maintenance for herself the sum of Six Hundred ($600.00) Dollars per month beginning on the first day of each succeeding month subsequent to date of final decree of Dissolution of Marriage, said payments to continue until the Respondent remarries or dies, whichever occurs first. Additionally, Petitioner shall pay to the Respondent a lump sum of Nine Hundred and Twenty Six ($926.00) Dollars maintenance on the 31st day of March of each succeeding year that the maintenance is paid according to the limits herein set out, starting in 1975. Further, it is mutually understood and agreed that this paragraph shall not be reviewable by a court of law, and is absolutely final.

On December 31, 1981, Dreana and Arthur L. Zepf, Jr., a single man, purchased a townhouse in New Jersey as joint tenants with right of survivorship. They moved in together at that time, sharing personal assets such as furniture and sharing expenses on food, utility payments and other bills. Soon after discovering that Dreana and Zepf had moved in together, Jack filed, on January 27, 1982, a motion to terminate former spouse support as a result of de facto marriage. On September 14, 1982, the trial court denied this motion and Jack appeals. We affirm.

Jack's initial argument is that maintenance payments to a former spouse should be automatically terminated upon that former spouse's unmarried cohabitation in a "marriage-resembling" relationship. While we find his argument interesting and original, we cannot agree with his ultimate contention.

The Kentucky statute which controls the discontinuance of maintenance payments upon remarriage is K.R.S. 403.250(2):

Unless otherwise agreed in writing or expressly provided in the decree, the obligation to pay future maintenance is terminated upon the death of either party or the remarriage of the party receiving maintenance.

Jack maintains that this statute should apply to cohabitation as well as remarriage. In support of his argument, Jack cites *McCord v. McCord*, Ky.App., 558 S.W.2d 624 (1977), in which our Court upheld the denial of reinstatement of alimony to a woman whose remarriage was subsequently annulled. Had Dreana remarried and then divorced or had that remarriage annulled, the *McCord* case might have relevance here. However, as she has not remarried, the principles of *McCord* do not apply.

Jack would have us presume that Dreana is now being supported by Zepf and that her choice to live with Zepf constitutes an abandonment of the maintenance provisions found in their separation agreement. In *Williams v. Williams*, Ky.App., 554 S.W.2d 880 (1977), our Court did terminate maintenance when the former wife formed a "lasting relationship" with a man of means. However, that case was so decided because the circumstances as a whole had changed so much as to make the terms of their contract unreasonably favorable to the

wife. There, the wife, "because of the generosity of her friend," had sizable savings and checking accounts and was being maintained in a comfortable fashion. The husband, on the other hand, had financial problems and it appeared that the status of the parties would continue.

In the case at bar, there is no evidence that Zepf is contributing to Dreana's support. To the contrary, the record indicates that their relationship is more like a roommate situation with each individual paying his or her own way. Jack's salary has not waned and, unlike *Williams, supra,* there are not such substantial changes in circumstances present here to warrant termination of maintenance.

Although both parties have cited conflicting views from our sister states, in Kentucky we are bound by K.R.S. 403.250. The language of that statute is clear and unambiguous. *Clark v. Clark,* Ky.App., 601 S.W.2d 614 (1980). Jack would have us rewrite the statute to include the term "cohabitation." However, as that is not what the plain language of K.R.S. 403.250 says, we cannot strain to redraft it to conform to Jack's interpretation. *Id.*

Jack's next arguments relate to the separation agreement which the parties executed in anticipation of their dissolution of marriage. He contends that, by her behavior, Dreana violated the intent of the agreement, violated a state law and caused a failure of consideration, thereby forfeiting her right to continuing benefits. However, absent circumstances which would make the terms of this contract unconscionable, the maintenance provision may not be modified. The decree of dissolution incorporated the contract which contained a clause making it nonreviewable and final. K.R.S. 403.180(6) states:

> ... [T]he decree may expressly preclude or limit modification of terms if the separation agreement so provides ....

Jack signed the contract willingly and apparently against the advice of his own attorney. His arguments fail to convince us that the agreement has become inequitable and we cannot set it aside simply because Jack now feels he has gotten a "bad bargain." *Peterson v. Peterson,* Ky.App., 583 S.W.2d 707 (1979).

Many of the arguments in the briefs go to moral issues we need not address here. We do not find this to be a case where new ground should be broken in Kentucky law.

The trial court did not err in denying Jack's motion to terminate support. We therefore affirm the judgment of the trial court.

REYNOLDS, J., concurs.

MILLER, J., dissents.

MILLER, Judge, dissenting.

The majority opinion grants approbation to an offensive practice pervading our society. The result is counterproductive toward allaying the turbulence in the wake of marital dissolution, one of the most devastating of all human experiences. There is something distasteful in requiring one to subsidize a former spouse, in his or her subsequent cohabitation. The policy manifesting this distaste is set forth in KRS 403.250(2) which provides for the termination of maintenance in the event of remarriage of the recipient, unless expressly agreed otherwise in writing. Under our system the bias of the law mandates a cessation of maintenance payments upon remarriage of the recipient. The rule has been extended to permit termination upon nonmarital cohabitation, a practice now commonplace and more frequently tolerated by the prevailing moral precepts of society. *See* Oldham, *The Effect of Unmarried Cohabitation by a Former Spouse Upon His or Her Right to Continue to Receive Alimony,* 17 J.Fam.L. 249 (1978). To me, it is insignificant whether the rule terminating maintenance be grounded upon moral circumstances, upon the practicable consideration that remarriage or nonmarital cohabitation removes the necessity of support or upon some neutral principle of law. For whatev-

er reason, maintenance is, unless agreed otherwise, terminated upon remarriage and not infrequently upon nonmarital cohabitation. The strength of this concept in our jurisdiction is amplified in *McCord v. McCord,* Ky.App., 558 S.W.2d 624 (1977), wherein it was held that a subsequent marriage, although later annulled, terminated maintenance payments and that the payments were not revived upon the annulment. In *McCord,* the Court was faced with the unprecedented issue of reinstating the maintenance payments against a former husband after a second marriage, of but a few weeks duration, ended by annulment. The Court opted for the stronger policy of forever terminating maintenance payments upon remarriage, notwithstanding the second marriage was later to be ruled an annulity. Thus, we have adopted the principle that cohabitation, under a voidable marriage, operates to permanently terminate maintenance payments. I believe this relevant to the case at hand. The *McCord* case lends credence to the fact that the ultimate consideration is not the simple need for maintenance. Certainly Mrs. McCord's need for maintenance was as great, if not greater, after the termination of her second cohabitation. Nevertheless, the Court refused to reinstate her maintenance rights against her former spouse. The net result was that the Court felt that equity demanded termination of maintenance upon subsequent marriage although the latter marriage was in fact subject to annulment.

Consistent with the policy of our statute, the Lydics agreed to terminate maintenance upon Mrs. Lydic's remarriage. The proviso was not an open-end agreement. *Cf. Dame v. Dame,* Ky., 628 S.W.2d 625 (1982). By its terms it was not subject to modification. True, Mrs. Lydic has not remarried in a traditional sense, but has chosen a lifestyle having the attributes of marriage. She is cohabiting with a member of the opposite sex and has placed her townhouse, a significant part of her estate, in survivorship with her male cohabitor. Every indication is that her cohabitation is intense and of contemplated endurance. In short, it is as permanent as a matrimonial affair. Indeed, if her relationship with her nonmarital cohabitor is to be dissolved, it may well involve a judicial determination of property rights. *See Marvin v. Marvin,* 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976); *Crutchfield, Nonmarital Relationships and Their Impact on the Institution of Marriage and the Traditional Family Structure,* 19 J.Fam.L. 247 (1981); Annot., 3 A.L.R. 4th 13 (1981). Moreover, I am considerably influenced in my conclusion by the fact that at the time of the separation agreement nonmarital cohabitation was condemned as illegal under a criminal statute then in existence. KRS 436.070 (now repealed). In agreeing to the maintenance provision, Mr. Lydic was not bound to anticipate the engagement of Mrs. Lydic in an illegal act.

This jurisdiction is committed to the proposition that non-modifiable maintenance agreements, such as the one at hand, are in the nature of a contract. *See Dame, supra.* As such, it is my view that their validity may be determined in accordance with established principles of contract law. Under these principles, the executory maintenance contract may be rendered invalid for failure of consideration. I am compelled to conclude that, all things considered, the maintenance agreement is subject to voiding because Mr. Lydic anticipated that Mrs. Lydic would maintain herself in a position of probable remarriage. Such was a material part of the contractual consideration. Mrs. Lydic has chosen to place herself in a position which far lessens the probability of remarriage. At least her remarriage to one other than her cohabitor, to whom she shows no inclination to marry, would be predicated upon dissolving her present arrangement. In my mind this amounts to a failure of consideration for which the maintenance payments could be terminated under neutral principles of contract law.

For the foregoing reasons I respectfully dissent and would reverse the decision of the Jefferson Circuit Court.